UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

LYDIA CONLAY,                          §
                   *Plaintiff,*        §
                                       §
v.                                     §          CIVIL ACTION H-08-1038
                                       §
BAYLOR COLLEGE OF MEDICINE and         §
MAYA SURESH,                           §
                   *Defendants.*       §

## OPINION ON SUMMARY JUDGMENT

This opinion is in support of this court's order of January 15, 2010 granting

defendants' motion for summary judgment on plaintiff Dr. Lydia Conlay's

defamation and gender discrimination claims, and denying the motion on her Title

VII retaliation claims. (Dkt. 201).[1]

## 1.    Defamation

Conlay contends that defendants Dr. Maya Suresh and Baylor College of

Medicine are liable in defamation for a letter authored by Suresh and published to

Conlay's supervisor, Dr. Stein and Baylor's then-President and CEO, Dr. Traber.[2]

In that letter,  addressed to Conlay and dated September 27, 2005, Suresh

criticized many aspects of Conlay's performance as Chair of the Anesthesiology

---

[1]     Both sides have filed copious objections to the other side's summary judgment
evidence. (Dkt. 159, 185). Except for contrary rulings contained in the body of
this opinion, those objections are overruled.

[2]     Plaintiff's Response in Opposition at 100 (Dkt. 161).

Department, in which Suresh also worked as a division chief.[3]  Defendants argue, among other things, that Conlay invited and thereby consented to the subsequent publication and republication of this letter to Stein and Traber, precluding liability for this intentional tort. The court agrees.

*Facts.* The sequence of events is not in dispute. Suresh handed the letter in an envelope to Conlay on the day it was written, September 27, 2005. Although the letter listed three cc's at the bottom—Dr. Traber, Dr. Stein, and Human Resources—Suresh  had not yet  sent it to anybody.[4] Conlay did not immediately open the letter, but discussed its contents with Suresh in a long one-on-one meeting. By the end of the meeting, Conlay felt there was no longer any discord between them and they had come to an agreement—Suresh would not send out copies of the letter.[5]

There matters stood until March the following year, when Conlay was preparing for an external review of the Anesthesiology Department. Concerned

---

[3]     D.Ex. 20. The letter grouped its criticism of Conlay into four categories: "1) My observation of your lack of leadership during preparation for Hurricane Rita, 2) To express my grievance with regards to your recent demeaning and derogatory behavior towards me, 3) To share the dissatisfaction of the members of the Department of Anesthesiology i.e. faculty, residents, medical students, and support staff with your leadership and treatment towards them, 4) Discrimination and disparity in salaries." *Id.* at 1.

[4]     Conlay Dep. at 254.

[5]     Conlay Dep. at 254; Suresh Dep. 86.

that the critical letter might surface during the review,[6] Conlay contacted Human Resources on March 6 to report a "bizarre letter" given to her by a faculty member.[7] When asked to name the faculty member so HR could follow up on the letter's discrimination claim, Conlay declined, asserting that it would be "distracting" to the ongoing audit, and that the matter "had been pretty much resolved" anyway. Conlay promised to reveal the complainant's name after the audit, and the HR representative agreed.[8]

On April 5, after the review was done, Conlay called  HR and identified

---

[6]     Conlay Dep. 256. Conlay claimed that Suresh had given her different stories about where the letter was. *Id.* There is no evidence that Stein, Traber, or Human Resources had seen the letter prior to Conlay's contacting HR.

[7]     An HR memo documented her call:

PC from Dr. Conlay on or about 3/6/06. She said that a faculty member had handed her a very bizarre letter and she didn't know what to do with it. Conlay said the letter accused her of not meeting with her faculty (they have weekly faculty meetings), of not handling promotions right (The person is the head of the promotions committee), wondering why Dr. Conlay had laid off "all the blacks" some time ago, etc. Dr. Conlay said that after she discussed the letter with the faculty member and went over each point, the faculty member said that she was satisfied that the letter actually had no merit.  When I said that I needed to look into the racial discrimination allegation Dr. Conlay said that she didn't want to give me the name of the faculty member right then, as they were just about to go through an accreditation audit and it would be distracting. More importantly, Dr. Conlay said that she believed that the matter had been pretty much resolved. She said that she would call me re the name of the faculty member after the audit. I agreed.  (D.Ex. 34, p.4 (Dkt. 131-2).

[8]     *Id.*

Suresh as the author of the "bizarre letter."[9] Conlay again down-played the letter's significance, explaining that Suresh was undergoing severe personal and medical problems at the time, and that the letter represented a sort of "melt-down" due to personal stress.   HR advised that they would call Suresh to follow up on the RIF issue to see if she still felt there was a discrimination problem. Conlay told Suresh that her letter had been reported to HR and that someone from HR would contact her.[10]  HR did so later that day, and reviewed with Suresh the process used by HR in analyzing a RIF. Suresh seemed satisfied that the department lay-offs had been handled fairly and without discrimination, and sent a confirming e-mail to that effect.[11]

HR promptly reported these developments to Conlay, and requested a copy of the original letter, along with Conlay's response to each complaint, for their files.[12] This request triggered a series of emails between Conlay and Dr. Joseph L. Reeves-Viets, a friend and colleague who served as Vice-Chair of the Anesthesiology Department.[13] In reply to his concern that a detailed response to

---

[9]        D.Ex.34, at p. 2.

[10]        *Id.*

[11]        *Id.* at p.3.

[12]        *Id.*

[13]        D.Ex. 73.

4

the letter might dignify the attack by "protest[ing] too much," Conlay wrote:

> Once HR wants a copy of the entire letter, it's so vitupritive [sic] that I need to include information that discredits each point so that the parts I can't discredit (my allegedly inappropriate behavior) are taken in context. When nothing else in the letter is true, why should that be any more likely to be? Agree that it is defensive, *but I do not think the letter could go over with those things unaddressed.* I have left an envelope for you in your office so that you have a copy of all of it as well.

D.Ex. 73 (emphasis added). Conlay sent the letter to HR, along with her defensive editorial comments.[14]

Two months later in June 2006, Stein asked Suresh for a copy of the letter.[15] Stein was prompted to make the request because he had been told that it contained allegations raising HR issues.[16] Suresh complied with this request from her superior.[17] Stein in turn passed the letter on to his superior, Dr. Traber, Baylor's CEO.[18] Conlay's defamation claim is based on this publication to Stein and republication to Traber.

---

[14]    D.Ex.45.

[15]    Stein Dep. 81. The plaintiff has submitted complete copies of the depositions of Stein, Traber, and Suresh (among others) as unnumbered exhibits in response to the summary judgment motion. (Dkt. 161-2).

[16]    Stein Dep. 81-82; Suresh Dep. 84. The court overrules plaintiff's objections to Suresh's testimony on this issue, which is relevant to her state of mind in publishing the letter.

[17]    Suresh Dep. 84-85.

[18]    Stein Dep. 82.

*Analysis.* Consent creates an absolute bar to a defamation suit. "[T]he consent of another to the publication of defamatory matter concerning him is a complete defense to his action for defamation." RESTATEMENT (SECOND) OF TORTS § 583 (1977). This is an application of the ancient common law principle expressed in the maxim *volenti non fit injuria*—to one who is willing, no wrong is done. PROSSER & KEETON ON TORTS § 18, at 112 (5th ed. 1984). Texas has long followed this general rule. "[I]f the publication of which the plaintiff complains was consented to, authorized, invited or procured by the plaintiff, he cannot recover for injuries sustained by reason of the publication." *Lyle v. Waddle,* 144 Tex. 90, 188 S.W.2d 770, 772 (1945) (citing earlier cases).

Later cases have applied the rule in a variety of contexts when a defendant has published defamatory information in response to a plaintiff's general authorization or invitation. In *Smith v. Holley,* 827 S.W.2d 433 (Tex. App.—San Antonio 1992, writ denied), plaintiff authorized a prospective employer to conduct a background check into her previous employment. Her employment application was denied based on unfavorable information from her prior employer. The court held that her defamation claim against her former supervisor was barred by consent. In *Duncantell v. Universal Life Ins. Co.,* 446 S.W. 2d 934 (Tex. Civ. App. Houston [14th Dist.] 1969, writ ref'd n.r.e.), the plaintiff, while applying for a job, dialed the telephone number of a former employer and handed the phone to the

6

prospective employer. The court ruled that the former employer's defamatory remarks were not actionable.  *Id.* at 936.

A somewhat analogous case is *Mayfield v. Gleichart,* 437 S.W.2d 638 (Tex. Civ. App.—Dallas 1969, no writ).  Dr. Mayfield sued Methodist Hospital and others for a defamatory report by another doctor accusing her of unprofessional conduct. As a result of the report, Mayfield was excluded from the medical staff of the hospital and expelled from the Dallas County Medical Society, Texas Medical Association, and American Medical Association. When Mayfield protested her loss of staff privileges to the Dallas County Medical Society, she requested the hospital to furnish relevant information to the Society, including the defamatory report. The court ruled in favor of the hospital as a matter of law, because "publication of the alleged libelous statements was invited and instigated by Dr. Mayfield herself." *Id.* at 642.[19]

The uncontroverted sequence of events described above leads to the conclusion that the publication of Suresh's letter was likewise invited and instigated by Conlay. By first mentioning and then providing the letter to HR, Conlay set in motion a chain of events which predictably assured the publication of the letter to Stein and Traber.  Suresh had kept her agreement not to publish the

---

[19]     The court also held that the hospital was shielded by qualified privilege and an absence of malice.

letter, until  Conlay herself broached the subject with HR. Her contact with HR brought the letter to the attention of Stein, who as dean had responsibility for such faculty-related matters. When Stein requested a copy of the letter from Suresh, she reasonably complied, knowing that Conlay herself had initiated an inquiry by HR into the letter's allegations.

"One of the primary purposes of the doctrine of consent in defamation law is to prevent a party from inviting or inducing indiscretion and thereby laying the foundation of a lawsuit for his own pecuniary gain." *Royer v. Steinberg,* 90 Cal. App. 3d 490, 153 Cal.Rptr. 499, 504 (1979), citing PROSSER ON TORTS at 784 (4th ed.1971). Whether or not Conlay intended to set such a legal trap, her own actions invited Suresh's publication to Stein. Having induced indiscretion on the part of the defendants, Conlay's consent bars her defamation claims.

Conlay resists this conclusion by arguing that her consent was not voluntary, since she was required by HR to provide a copy of the letter to complete its investigation. It is true that an effective consent requires the absence of coercion.[20] However, Conlay's own deposition testimony belies any claim of

---

[20]    The Restatement (Second) of Torts § 892 defines consent as follows:
>    (1) Consent is willingness in fact for conduct to occur. It may be manifested by action or inaction and need not be communicated to the actor.
>    (2) If words or conduct are reasonably understood by another to be intended as consent, they constitute apparent consent and are as effective as consent in fact. RESTATEMENT (SECOND) OF TORTS § 892 (1977).

coercion. Asked why she initiated the conversation with HR about the letter, Conlay answered that it was because she thought the letter "might surface again during the [departmental] review."[21] While HR's policy may have called for investigation of any allegations of discriminatory employment practices, that policy did not cause Conlay to raise the issue when she did. Otherwise, she would have brought the matter to HR's attention six months earlier. Conlay acted to neutralize a possible source of job-related criticism at a time when her overall performance was under intense scrutiny.  This best-defense-is-a-good-offense strategy is reflected in her characterization of the letter as "bizarre," her suggestion that the letter's author  was undergoing a "meltdown" due to personal stress, and her detailed rebuttal to all the letter's charges, even those unrelated to discrimination.

In short, Conlay made a conscious (and rational) choice. Rather than remain silent in the hope that the letter would not surface, she acted preemptively to present the letter in a way least likely to diminish her standing in the eyes of her superiors. The downside of this calculated risk was that the letter would likely come to the attention of Stein and Traber, as it did.  Her conduct manifested consent, i.e. a willingness in fact for publication of the letter to occur.  Her

---

[21]     Conlay Dep. 256.

defamation claims against Suresh and Baylor are accordingly denied.[22]

## 2.    Gender Discrimination

Conlay alleges that Baylor's decision to remove her as Chair of the Anesthesiology Department and reassign her to the VA hospital in January 2007 was motivated by unlawful gender discrimination. Baylor has moved for summary judgment on the grounds that gender played no role in the decision and that pretext has not been shown.

The standard for resolving summary judgment motions in Title VII cases is too familiar to warrant extended recitation. The Supreme Court succinctly summarized the inquiry in *Reeves v. Sanderson Plumbing Prods. Inc.* :

> Whether judgment as a matter of law is appropriate in any particular case will depend on a number of factors. Those include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.

530 U.S. at 148-49.

The parties have devoted  inordinate  briefing space to debating the fourth element of the plaintiff's *prima facie* case (the first three elements are uncontested).

---

[22]    In light of this holding, the court expresses no opinion on defendants' alternative arguments attacking the defamation claim, such as qualified privilege, lack of actual malice, substantial truth, and consent based on Conlay's disclosure of the letter to Reeves-Viets.

Plaintiff contends that the fourth element listed in *McDonnell Douglas* —"after [her] rejection, the position remained open and the employer continued to seek applicants"—should apply, even though *McDonnell Douglas* involved a rejected applicant, rather than a demoted employee. Defendants contend that plaintiff must show <u>either</u> that she was replaced by someone outside the protected class <u>or</u> that others similarly situated were treated more favorably, citing *Septimus v. Univ. of Houston*, 399 F.3d 601, 609 (5th Cir. 2005).

Both sides are wrong. The Supreme Court in *McDonnell Douglas* expressly cautioned against enshrining a fixed set of elements for every Title VII case. "The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from [the plaintiff] is not necessarily applicable in every respect to differing factual situations."[23] And the Fifth Circuit has often declared that the four elements of McDonnell Douglas are by no means the only way of proving a prima facie case. *See Byrd v. Roadway Express, Inc.,* 687 F.2d 85,86 (5th Cir. 1982) ("[N]o single formulation of the prima facie evidence test may fairly be expected to capture the many guises in which discrimination may appear"); *Jones v. Western Geophysical Co. of America,* 669 F.2d 280, 284 (5th Cir. 1982) (replacement by someone outside protected class not a necessary element); *Hedrick*

---

[23]    411 U.S. 792, 802 n.13 (1973).

*v. Hercules, Inc.,* 658 F.2d 1088, 1093 n. 4 (5th Cir. 1981) ("McDonnell Court did not intend to establish an exclusive prima facie evidence test for discrimination in employment").   In *Jatoi v. Hurst-Euless-Bedford Hosp. Auth.,* the Fifth Circuit explained the trial court's task:

> If a plaintiff cannot establish some or all of the *McDonnell Douglas* steps, the district court must examine all the evidence that has been adduced for other indicia of racial discrimination relating to his discharge and determine whether it is more likely than not that the employer's actions were based on illegal discriminatory criteria.

807 F.2d 1214, 1219 (5th Cir. 1987).

In other words, a plaintiff may defeat a summary judgment motion by any evidence from which the fact-finder might reasonably infer a discriminatory motive for the employer's action.   We now examine the summary judgment evidence to see whether a reasonable inference of gender discrimination may be drawn. For the sake of organization, the analysis of discriminatory motive will be grouped under categories of proof routinely found in Title VII cases.[24]

a.   <u>Gender-based comments</u>.   Comments by a decision-maker reflecting gender bias or stereotypes may support an inference of discrimination. *See Price*

---

[24]   Neither side contends that there is direct evidence of discrimination, but that is a moot point in light of the Supreme Court's instruction that, in Title VII  as in any other civil or criminal litigation,  the probative value of evidence does not depend on its classification as direct or circumstantial. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003).

*Waterhouse v. Hopkins,* 490 U.S. 228, 234-35 (1989).  Such comments need not be directly related to the plaintiff or the employment decision at issue in order to be probative. *Reeves v. Sanderson Plumbing Prods. Inc.,* 530 U.S. 133, 152 (2000).  The two decision-makers responsible for Conlay's removal were Stein and Traber.[25]Conlay characterizes Stein as the "principal discriminator", with Traber in the role of facilitator, allowing Stein to carry out his discriminatory purpose. Conlay points to four specific comments by Stein—one about women in general, three critical of particular female faculty members.[26]  Considered in context, none of these statements support an inference of gender bias.

The general comment attributed to Stein was that "women can be their own worst enemies." This ironic phrase is a bromide traceable to Cicero ("man is his own worst enemy")[27], and reiterated in various ways by numerous writers in succeeding centuries.  It is more naturally considered a rueful expression of sympathetic frustration (as in "those Astros are their own worst enemy') rather than a slur. Although the phrase may well be a cliche,  it does not reflect a stereotypically demeaning or insulting view of women.

---

[25]    Traber Dep. 20, 22, 67; Stein Dep. 21-22.

[26]    Conlay Dep. 34-35, 40-41.

[27]    Marcus Tullius Cicero,  Epistolae ad Atticum (X, 12a, sec. III) (*"Nihil inimicius quam sibi ipse"*).

On that same occasion, Stein allegedly referred to Dr. Nancy Nussmeier as a "real piece of work", and called Dr. Alina Grigore "needy and pathological." On another occasion Conlay claims that Stein sarcastically remarked "Little Lindsay's a Chair" after learning that former Baylor doctor Lindsay Henson had been appointed to a Chair position in Tennessee.  While these remarks are hardly positive or flattering, Title VII does not require that employers speak kindly of employees at all times. A propensity to speak ill only of women and never of men might be probative of bias, but that is not the case here—Conlay admits that Stein has aimed cutting remarks at men as well.[28]  A reasonable jury could not infer gender bias from these isolated remarks.

b.  <u>Dissimilar treatment</u>.  Another accepted type of Title VII proof is preferential treatment of similarly situated employees outside the plaintiff's protected class. *Nieto v. L&H Packing Co.,* 108 F.3d 621, 623 (5th Cir.1997). This typically requires a showing that the conduct leading to the plaintiff's discharge or demotion was "nearly identical" to that engaged in by other employees. *Okoye v. University of Texas Houston Health Science Center*, 245 F.3d 507 (5th Cir. 2001). Conlay does not allege that Baylor has never removed male Chairs from their

---

[28]    E.g. Stein referred to a male doctor as "toast." Conlay Dep. 38.

positions following a performance review.[29]   However, she does claim less favorable treatment than her immediate predecessor, Dr. Dunbar, who was allowed to return to his former position as Baylor professor of pediatric anesthesiolgy when he stepped down as Interim Chair.[30]   Following her demotion, Conlay was assigned to the Veteran's Administration hospital, rather than another position at Baylor. Conlay's situation was not nearly identical to Dunbar's, however, because prior to becoming Chair she had never previously  held any position at Baylor.[31] This comparison warrants no inference of discriminatory intent.

        c.    <u>Other employment actions</u>. Conlay claims that Stein made other employment decisions adversely affecting female faculty members. For example, she claims that Stein refused to consider Dr. Nussmeier for tenure after joining Baylor from the Texas Heart Institute.   But the record indicates that Stein applied a one year hold on all tenure applications for any doctor coming from THI, male or female.[32] Similarly, Conlay points to Stein's role in the decision not to renew Grigoire's contract. But the record shows the actual decision was made by others

---

[29]    Baylor in fact removed two males (Simpson and Lillian) from their chair positions following negative external reviews of their departments. Stein Dep. 184-185; Traber Dep. 94.

[30]    Conlay Dep. 183-84, 199.

[31]    D.Ex. 2.

[32]    Stein Dep. 141, 215-16, 226-27; D.Ex. 64.

associated with THI.[33] Although Stein approved the decision, he was not part of the decision-making process leading up to the decision. There is nothing to suggest that gender bias played a role in that process.

d. <u>Statistics.</u> Conlay argues that discriminatory bias may be inferred from the failure of Stein to appoint a female to any of seven clinical Chair openings since 2005.   While relevant, statistics do not ordinarily suffice to prove the requisite discriminatory intent in individual disparate treatment cases.  *See Furnco Constr. Co. v. Waters,* 438 U.S. 567, 580 (1978);  *Walther v. Lone Star Gas Co.,* 977 F.2d 161, 162 (5th Cir. 1992) ("[P]roof of pretext, hence of discriminatory *intent,* by statistics *alone* would be a challenging endeavor.").   Raw statistics  are rarely probative of anything. To be meaningful, further refinement (if not always expert analysis) is required. For example, statistical evidence of discriminatory hiring must compare the persons hired to the pool of qualified applicants or candidates for that position. *See Scott v. Univ. of Mississippi,* 148 F.3d 493, 510 (5th Cir. 1998), *citing Anderson v. Douglas & Lomason Co.,* 26 F.3d 1277, 1286-87 (5th Cir. 1994).

Conlay has offered no proof of the make-up of the selection pool, beyond the bare assumption that an unspecified number of females in Baylor's clinical departments were qualified to be chairs.[34] Nor has Conlay offered any proof that

---

[33]     Stein Dep. 190-91.

[34]     Traber Dep. 80-81.

those females were better qualified than the males actually selected for the positions. Another shortcoming is that Conlay's sample size (7) is too small to be particularly meaningful. *See Adams v. Reed,* 567 F.2d 1283, 1286 (5th Cir. 1978) (comparison showing that defendant employed females at less than 10% of the rate of females employed in similar positions nationwide held insufficient to establish prima facie case because "the numbers . . . are drawn from a pool too small to produce highly valuable evidence."); *see also Mems v. City of St. Paul,* 224 F.3d 735, 740-41 (8th Cir. 2000) (sample size of three to seven was too small to be significant in race discrimination case); *Shutt v. Sandoz Crop Protection Corp.,* 944 F.2d 1431, 1433-34 (9th Cir. 1991) (sample of 11 is too small to establish a statistical pattern of age discrimination).

_____Conlay's argument that she is the first woman in history to hold a clinical chair  at Baylor is also beside the point. This is not a hiring discrimination case, and Baylor's employment decisions prior to Conlay's arrival are simply immaterial. If anything, Conlay's own selection to this prestigious position would seem to herald a significant break from the past. Conlay tries to blunt the point by observing (rightly) that the persons responsible for her demotion (Stein and Traber) were not the ones responsible for her  hire. And that is precisely the point —neither Stein nor Traber were responsible  for Baylor's departmental hiring history  prior to Conlay's arrival.

17

In short, Conlay's statistical evidence is insufficient to generate a reasonable inference of gender bias on the part of Baylor's decision-makers.

e.  Pretext.  Baylor's articulated reason for Conlay's demotion was poor leadership ability, manifested in various ways throughout her tenure: a negative independent review of her department, failure to retain the Pediatric Anesthesiology Group within her department,  problematic relationships with related hospitals such as Methodist, Texas Children's, and the Texas Heart Institute; and assorted other difficulties with faculty, residents, and doctors at affiliated hospitals.[35]  Conlay asserts that Baylor has offered shifting rationales for its decision, but in fact the overarching reason— poor leadership —has remained constant. To be sure, Traber and Stein do not use exactly the same words to describe their decision, and perhaps place different  emphasis on particular manifestations of her inadequate leadership, which is to be expected.  And while Conlay offers a vigorous defense of her performance as Chair during this time, there is little dispute that the incidents cited by Baylor did in fact occur—her department did receive a critical external review, Methodist did terminate her appointment as Anesthesiology Service Chief, the Pediatric Anesthesiology Group

---

[35]    D.Ex.26; Traber Dep. 42-49; Stein Dep. 31-34.

did leave her department, there was friction with THI and TCH, etc.[36]  Conlay
disputes both the cause and significance of these events, but the evidence is simply
insufficient for a reasonable jury to find that Baylor's articulated reason was a
pretext for <u>gender</u> discrimination.[37]

   f. <u>Other circumstances</u>. The foregoing discussion deals with Conlay's
main arguments concerning gender bias. To be sure, Conlay's brief and supporting
affidavit offer a winding 194-page stream of lesser supporting arguments and
contentions, which the court has also considered and rejected. Only a few of these
warrant mention here. An incessant refrain is  that neither Stein nor Traber
explained to Conlay their reasons for her removal. But that silence says nothing
about their motivation in making the decision. Conlay also loudly complains that
the negative departmental review was a set-up and a sham, primarily because Stein
declined to use her suggested reviewers. But there is  no evidence that the
reviewers themselves held any gender bias, or that they were instructed to slant
their findings to justify removing Conlay because she was female.

   Finally, Conlay refers to a statement purportedly made by Dr. Reeves-Viets
after a meeting with Stein, Conlay and another physician, calling Stein a

---

[36] D.Ex.72; Conlay Dep. 250-51; D.Ex.9; Conlay Dep. 85-86, 101, 104-05, 158;
Traber Dep. 43, 150-52; D.Ex. 14.

[37] As explained below, however, the timing of the decision is sufficient to create a
jury issue on the retaliation claims.

"misogynist". This statement is related by Conlay; there is no deposition or affidavit from Reeves-Viets in the record explaining the basis for his remark.[38] Baylor has objected to this evidence as hearsay, and the court agrees. The statement is not an admission of a party-opponent under FRE 801(d)(2)(D), because Reeves-Viets' name-calling did not concern a matter within the scope of his agency relationship with Baylor – Reeves-Viets was a friend, confidante, and subordinate employee to Conlay,[39] and his remark was made in that capacity. *See Staheli v. University of Mississippi,* 854 F.2d 121, 126-27 (5th Cir. 1988) (comment by faculty member that Chancellor was "vindictive" and held a grudge ruled inadmissible because it did not concern a matter with the scope of his agency and "was made in his capacity as wiseacre only."). Nor does the statement fall within exceptions to the hearsay rule argued by Conlay: it is not a "present sense impression" under FRE 803(1) because it does not purport to describe an "event or condition" immediately perceived by the declarant; nor is it an "excited utterance" under FRE 803(2) because it does not relate to a "startling event or condition", and was not made under the "stress of excitement caused by the event or condition."

---

[38]   Conlay Aff. at 7.

[39]   *See e.g.,* D.Ex. 4; D.Ex. 73.

Considering all of Conlay's evidence, whether separately or in combination, a reasonable jury could not find that her demotion and reassignment by Baylor were based on gender discrimination.

### 3.    Retaliation

Conlay contends that Baylor's decision to remove her as Chair and reassign her to the VA hospital was in retaliation for protected activity under Title VII[40]— an email she sent to Traber in April 2006 expressing her concern that her rumored removal may be related to her gender,[41] and the two EEOC charges she filed in December 2006 and September 2007.[42]   Title VII's anti-retaliation clause prohibits employer actions that discriminate against an employee because she has opposed a practice that Title VII forbids or has participated in a Title VII proceeding. 42 U.S.C. § 2000e-3(a). A Title VII retaliation claim has three elements: (1) protected activity by the plaintiff, (2) adverse action by the employer, and (3) a "but for"

---

[40]    Conlay also asserts that other events associated with the reassignment to the VA hospital are also in retaliation for her protected activity. For purposes of this motion there is no need to decide whether any of these related acts, standing alone, would constitute a "materially adverse action" under *Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006). The demotion and reassignment to the VA , together with the recent salary reduction, satisfy the adverse action element.

[41]    D.Ex. 43. Baylor does not dispute that this email constitutes protected opposition activity under Title VII. (Dkt. 124 at p. 39.)

[42]    P.Exs. 33, 34.

causal nexus between the two.  *Pierce v. Texas Dep't of Criminal Justice,* 37 F.3d 1146, 1151 (5th Cir. 1994).

Baylor's motion for summary judgment focuses primarily upon the third element, i.e. causal nexus. Baylor argues, correctly, that the EEOC charges could not possibly have played any role in the decision to remove Conlay from the Chair position, because the first of those charges was filed December 15, 2006, the day after Conlay was notified of that decision.

But Conlay's April 2006 email to Traber is a different matter. Baylor contends that the eight month gap between this protected activity and the removal decision precludes a causal nexus finding as a matter of law. But that time span, while substantial,  is not so wide as to preclude any inference of causation.  *See Shirley v. Chrysler First, Inc.,* 970 F.2d 39, 44 (5th Cir. 1992) (14 month gap between EEOC charge and plaintiff's discharge is not legally conclusive proof against retaliation). Baylor's argument that such a time span is too long to infer a causal link is also inconsistent with its own proof concerning the reasons for Conlay's demotion, all of which are based on events occurring prior to the April e-mail.  A fact-finder may properly infer  retaliatory intent when the protected activity intervenes between the events cited to justify  the adverse employment action and the action itself. *Cf. Shirley v. Chrysler First, Inc.,* 970 F.2d 39, 43 (5th Cir. 1992) ("We find it surprising that suddenly, after Shirley filed her EEOC

22

complaint, problems with her work surfaced.").

Baylor also asserts that it is nonsensical for Conlay to contend that she was removed from the Chair position in retaliation for expressing concern that she was going to be removed because she was a woman. The court sees nothing illogical or contradictory about it. Given Baylor's concession that the email was protected activity, it makes no difference that her initial concerns about gender discrimination were mistaken.[43] Baylor also notes that Stein, one of the decision-makers, was not a recipient of the e-mail, and did not learn about it until the lawsuit was filed. But this is of no moment, because the e-mail was addressed to and read by the other decision-maker, Traber. Baylor's efforts to sever, as a matter of law, any possible causal link between the April 2006 e-mail and the removal decision are unavailing.

As for Conlay's assignment to the VA hospital, Baylor argues that the decision was not materially adverse under *Burlington Northern*, because Conlay's salary and benefit levels remained the same. *See Aryain v. Wal-Mart Stores of Texas, L.P.*, 534 F.3d 473, 485 (5th Cir. 2008). Conlay responded that the VA position offered much less security than her old job because the VA provided no

---

[43]   Under Title VII's opposition clause, a plaintiff's opposition activity is not protected unless it is based on a reasonable belief that the employer action violated Title VII. *Byers v. Dallas Morning News, Inc.*, 209 F.3d 418, 428 (5th Cir. 2000).

salary support by generating revenue for Baylor. Events subsequent to the summary judgment hearing have justified these concerns. On January 11, 2010, Baylor notified Conlay that her salary would soon be reduced from over $500,000 to $11,000 annually, due in large part to the lack of offsetting revenue support for her salary.[44] Such a substantial pay cut is obviously a materially adverse action, as was the initial assignment to this less secure position in January 2007.

Finally, Baylor contends that Suresh, who along with Stein made the decision to assign Conlay to the VA, was not aware of her EEOC charges at the time of the decision. Again, assuming this were true, the casual nexus would not be broken, because her co-decision-maker Stein was admittedly aware of the December EEOC charge.[45]

For all these reasons, Baylor's motion for summary judgment on Conlay's Title VII retaliation claims is denied.

Signed at Houston, Texas on January 29, 2010.


Stephen Wm Smith
United States Magistrate Judge

---

[44]     Dkt. 190-1, at p.5.

[45]     Stein Dep. 52.

24